### E. J. Jackson v. The State.

#### No. 3724.   Decided November 17, 1915.

**1.—Murder—Newly Discovered Evidence—Presumption—Practice on Appeal.**

In the absence of a statement of facts of the evidence upon newly discovered testimony, it must be presumed that the trial court properly overruled the motion on this ground. Following Knight v. State. 64 Texas Crim. Rep., 541, and other cases.

**2.—Same—Charge of Court—Self-defense—Trespass.**

Where, upon trial of murder and a conviction of manslaughter, the court, in his charge on self-defense, presented defendant's theory of self-defense as raised by the evidence, and especially presented the issue of trespass, and that the defendant had the right to order the deceased off his premises, etc., and use all necessary force to prevent deceased from entering into his house, even to the extent of killing him, after first resorting to every other means in his power, there was no reversible error on that ground.

**3.—Same—Charge of Court—Points at Issue—Self-defense.**

Where, upon trial of murder and a conviction of manslaughter, the court, in his charge on self-defense, did not require the jury to believe both and all the things stated by defendant before they were authorized to acquit him, the contention that the charge submitted numerous unimportant details, etc., was untenable. Distinguishing McMillan v. State, 165 S. W. Rep., 576.

**4.—Same—Charge of Court—Trespass—Requested Charge.**

Where, upon trial of murder and a conviction of manslaughter, the court's charge on self-defense, when considered as a whole, assumed defendant's right to forbid and prevent deceased from entering his house, and to use all force necessary to do this, even the taking of his life, provided he first used every other means, etc., there was no error in refusing defendant's special requested charge on the same subject. Following Patterson v. State, 46 Texas Crim. Rep., 613, and other cases.

**5.—Same—Requested Charge—Right of Going Armed—Trespass.**

Where, upon trial of murder and a conviction of manslaughter, defendant contended that deceased was a trespasser, and the court sufficiently charged upon this phase of the case, there was no error in refusing a requested charge that if the jury believed that during defendant's absence from home, the deceased went thereto, and was ordered away by defendant's wife, or that she so informed defendant, that then in either event, defendant had the right to arm himself to eject deceased from his premises, etc.

Appeal from the District Court of Houston. Tried below before the Hon. John S. Prince.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*J. E. Winfree* and *Earl Adams, Jr.,* for appellant.—On question of ejecting trespasser: Dodson v. State, 45 Texas Crim. Rep., 571; Nix v. State, 45 id., 504; Morrison v. State, 40 S. W. Rep., 591; McMillan. v. State, 165 S. W. Rep., 576; Graves v. State, 124 S. W. Rep., 676; Willis v. State, 75 S. W. Rep., 790.

On question of newly discovered evidence: Roy v. State, 24 Texas Crim. App., 369; Ford v. State, 41 Texas Crim. Rep., 1; Lindsey v. State, 50 id., 435; Sebastian v. State, 39 S. W. Rep., 680.

On question of court's charge on self-defense and defendant's right of going armed: Clark v. State, 51 Texas Crim. Rep., 519.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of requested charges: Ryan v. State, 142 S. W. Rep., 878; Byrd v. State, 140 S. W. Rep., 1087; Berg v. State, 142 S. W. Rep., 884.

On question of newly discovered evidence: Hollingsworth v. State, recently decided.

PRENDERGAST, PRESIDING JUDGE.—Under an indictment charging him with the murder of Jim Bridges, appellant was convicted of manslaughter and assessed the lowest punishment.

In his motion for a new trial he alleged newly discovered evidence from several persons. The State vigorously contested his motion on

every such ground. The record shows that the court heard evidence on the trial of these issues, but in no way shows to us what that evidence was. We must presume it supported the court in overruling the motion on those grounds. Therefore, under the well settled law of this State, we can not review that question. Knight v. State, 64 Texas Crim. Rep., 541, and cases there cited. We also cite some of them and others. Black v. State, 41 Texas Crim. Rep., 185; Mikel v. State, 43 Texas Crim. Rep., 615; Reinhard v. State, 52 Texas Crim. Rep., 59; Jarret v. State, 55 Texas Crim. Rep., 550; Williams v. State, 56 Texas Crim. Rep., 225; Tarleton v. State, 62 S. W. Rep., 748; Probest·v. State, 60 Texas Crim. Rep., 608; Patterson v. State, 63 Texas Crim. Rep., 297; Bailey v. State, 65 Texas Crim. Rep., 1; Clary v. State, 68 Texas Crim. Rep., 290; Brice v. State, 72 Texas Crim. Rep., 219; Hoskins v. State, 73 Texas Crim. Rep., 107. There are many other cases so holding. It is unnecessary to collate all of them.

The evidence raised, and the court in his charge submitted, manslaughter. Appellant made no objection to this charge or the submission of that issue.

The only objections he presents are to the charge of the court in submitting his claimed self-defenses. We will discuss those urged by him.

No extended statement of the evidence is necessary. From the State's side and a preponderance of the evidence, it was amply sufficient to show that appellant was guilty of murder. His testimony and that of his wife, which was pointedly disputed by that of the State and preponderated against him, raised the issue of manslaughter. Self-defense in different ways was also raised by his and his wife's testimony.

Early in the evening of the day of the killing Ernest Kelly, a comparatively young boy, got drunk. The deceased followed him for some distance, from the State's testimony, to take care of him and to take him home. In this effort he caught Ernest Kelly and struggled with him some distance and to and into a cotton house on the farm of Mr. Parker, adjoining appellant's. There was some testimony which tended to show that the deceased was beating Kelly instead of struggling with him to take him home and take care of him. Kelly, while drunk, from the State's standpoint, escaped from the deceased at said cotton house, went into appellant's house during his absence and sought protection against deceased from appellant's wife. Appellant's wife testified that, when Kelly came into her house for protection deceased followed him up to her premises, when she ordered him away. He then went away, according to her testimony. She claimed that, at this time, he used abusive, profane and insulting language towards her. The State's evidence, if believed, would clearly show that his wife in this particular was mistaken and that the deceased did not on this occasion go to or near her house, but instead, when Kelly escaped from him at said cotton house, some 150 or more yards from appellant's house, deceased went in an opposite direction. Some two or three hours later deceased, in company with his brother, Preston Bridges, and his uncle, Lee

Wilson,—all young men, as they testified, went in search of Ernest Kelly, deceased, claiming that Kelly was drunk in or about said cotton house and would freeze or take pneumonia. The weather was quite cold. These three young men ·in seeking Kelly went by said Mr. Parker's house where Parker and appellant were at the time. Appellant saw them and saw them go in the direction of said cotton house, which was towards his house. Mrs. Parker called her husband's attention in appellant's presence to the fact that those three boys might raise another row with Kelly and might go to appellant's house for that purpose. Appellant, thereupon, proceeded rapidly to his house. The three young men went by the cotton house and then on towards appellant's house. He reached his house before they did, went in the back way, procured his shotgun, loaded it with a buckshot shell and walked out on his front gallery thus armed as the three young men reached his yard approaching his house. Ben Jackson, appellant's young son, about grown, was on appellant's front gallery when these three young men approached the house.

The State's side of the question can be made to appear from said Lee Wilson's testimony, a portion of which is as follows:

"Jim (deceased) asked him (Ben) if Ernest Kelly was there, he said—'Yes'—Jim said that he wanted to see him—I spoke up and asked him if he had seen my hogs—he said—'They are here now.' Mr. Jackson came out about that ·time and said—'Leave here, God damn you, I don't want ·you here'—Jim said give me time and I will be gone.' He kept saying—leave, leave, I say, and raised his gun and shot. Jim was moving when Mr. Jackson shot, he had started to run, he just had made a start to run, he was going, I guess about west, his home was west from Jackson's, the nearest way to Jim's home would have been right across the fence the way that he had started when he fell. After I saw that Jackson looked like he was going to shoot Jim, I said—'Don't shoot him and I will see that he gets away.' Jackson did not say a word, it wasn't a second until he shot, after Mr. Jackson shot, Jim run something like ten feet, he had started and after he shot he run something like ten feet before he fell. Jackson hit him right along here in the breast (left side). Jim was not facing Mr. Jackson when Mr. Jackson told him to leave. Mr. Jackson was on the gallery and Jim was going in the direction towards his home. . . . When Mr. Jackson told him to get out of his yard, he said give him time and he would be clear gone. After Mr. Jackson shot he said—'You God damned son-of-a-bitch, I told you that I would kill you the first chance I got'—that is all that he said."

To the same effect was the testimony of Preston Bridges, deceased's brother, and said Ernest Kelly.

Appellant testified that when he reached his house he went in the back way; that his wife met him just inside the door and told him that when Ernest Kelly came in the house that evening drunk Jim Bridges, deceased, was running after him, and claims that she then told him all the claimed insulting and profane language used by de-

ceased towards her at the time; that he then got his gun, loaded it and told his wife that deceased "could not come in here." He testified that Kelly then called on him to protect him against the deceased, and further testified: "As I walked out of the room I went right straight out of the hall and went to the front steps, I did not get to the front steps, Ben was standing in front of the steps, Bridges and Wilson were coming up, just as quick as I got out there, I said—'Jim Bridges, you must not come in here'—he never made me no reply, I was walking on to the gallery, I said again: 'Jim Bridges, you must not come in here'—by that time I was in front of the steps, he said—'I come here to come in, by God, or die.' He then had his hand in his pocket and he began to draw a pistol, his right hand, and I shot him with a shotgun. I shot him because I expected him to shoot me if I didn't kill him, that is the reason that I shot him; that is all the conversation that passed between Jim Bridges and myself." Among other things, on cross-examination, he testified: ". . . Jim just kind of checked when he started to pull his gun, just kind of turned himself like he was making ready to shoot, just turned himself a little in a side position to shoot. I believed I could see the pistol just as he turned around. I do not know just how far Jim Bridges was from me when I shot him. He was something like ten or twelve feet." Again he testified: "Jim Bridges did run off; he went off when I shot him. He was standing still when I shot him. He had turned just right to draw a gun when I shot him. He turned his left hand just a little quartering to me." Again he testified: "I shot Jim Bridges because I expected him to shoot at me." Then he said that he went to his said neighbor Parker's just after the shooting and testified: "I told Mr. Parker that I told Jim Bridges to get out of the yard two or three times, and he made an attempt to draw a pistol, and I shot him." Appellant's wife in her testimony supported him in his on the main points.

Kelly denied positively that he made any request for appellant to protect him, but instead testified that when appellant got his gun, ". . . she (Mrs. Jackson) said—'I wouldn't do that, I don't believe' —Mr. Jackson said—'Yes, by God, I am going to kill him, God damned son-of-a-bitch.' . . . He loaded his gun and went out on the gallery, I was still sitting there. Ben Jackson was standing out there on the gallery. I told Mr. Jackson that I supposed that Jim wanted me, I said—'Mr. Jackson, don't kill him, I will go with him if he wants me'—he just went on, didn't make no reply, he went on out of the door. He said—'Get out of here, Jim Bridges, you God damned son-of-a-bitch.' I never heard Jim say anything, he was talking low if he said anything. Press Bridges and Lee Wilson said—'Mr. Jackson,. if you won't shoot him we will get him out of here just as quick as we can'—he said—'Yes, by God, I can get him out quicker than that.'" Kelly further testified that, just after the shooting, "Ben said—'Pa, you oughten to have killed him'—he said, 'Yes, by God, I told that God damned son-of-a-bitch six months ago if he ever come in my yard again I would kill him, and by God I have done what I said I would do.'"

Lee Wilson, Preston Bridges and Ernest Kelly each, in substance and effect, swore that deceased had no pistol and made no attempt to draw any, nor made any motion that would indicate that he attempted, or intended to draw a pistol. They each also swore that deceased did not say to appellant at any time that he intended to go into appellant's house or die. The testimony was amply sufficient to show that, when deceased fell, he fell on his face and stomach, and that his body was not disturbed until the sheriff came, who, with others, searched the body. No pistol was found on or about the body at any time by any person. The sheriff testified that the deceased's hands were in his breeches pockets; that in one pocket was a pocketknife, unopened, and deceased's hand not upon it.

Appellant did not introduce his son, Ben, nor have him testify.

John Newton lived in about 150 yards of appellant. He heard the shot that killed deceased and immediately went to appellant's. When he got there he said Mr. Jackson did not say anything to him until he spoke to him first. He said: "I asked him what the trouble was, and he said, 'Nothing, only I killed him'; then he spoke again and said, 'I told him to get out, and I killed him.'" He further said that appellant did not tell him that deceased told him he was going to come into the house or die; that he told him nothing of the kind.

Clint Lane testified that he went to appellant's house soon after the killing, and appellant talked to him. He said: "I went in the house where Jackson was. I asked Jackson why he killed this boy, and he told me, said, 'I told him not to come in my yard eight months ago, and I killed him because he came in here this afternoon.' That is just what Mr. Jackson told me. Jackson never told me that Jim Bridges said to him, 'I am coming in that house or die,' and that he pulled his pistol out of his pocket when he shot him. Jackson never told me that."

On the subject of appellant's claimed self-defenses, the court charged the jury as follows:

"A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"If from the evidence you believe that the defendant shot and killed the said Jim Bridges, but further believe that at the time of so doing that the deceased was drawing a pistol, or making a demonstration as if to draw a pistol, which caused the defendant to have a reasonable expectation of fear of death, or serious bodily injury at the hands of deceased, and, that acting upon such reasonable expectation of fear, the defendant shot and killed the deceased, then you should acquit him.

"If the defendant on arriving home on the evening of the homicide, was informed by his wife that the deceased had abused her and used insulting language toward her, or if Ernest Kelly asked the defendant

to protect him from an assault by the deceased, or by the deceased and others, then the defendant had the right to order the deceased off of his premises and to prevent the deceased from coming into his house, and if the defendant anticipated an attack by the deceased, he had the right to arm himself with his shotgun to protect himself from such an attack, and he had the right to use all force that was necessary, but no more than was necessary to force the deceased to leave his premises, and to prevent the deceased from entering his house. And if, under such circumstances defendant ordered the deceased to leave his premises and the deceased started to enter the house of defendant, defendant had a right to use all force necessary, even to the extent of taking his life to prevent his entering his home, provided he first used every other means in his power. And if you believe that defendant did order him to leave and the deceased started as if to enter the house, and made a demonstration as if to draw a pistol and the defendant believed that his life was in danger, or he was in danger of serious bodily harm, and acted upon such belief shot and killed the deceased, you should acquit him."

In addition, the court gave two charges requested by appellant, as follows:

"You are instructed that the defendant had the right to order the deceased off of his premises, or to order him not to come into his house, and to use all necessary force to cause the deceased to leave his premises, or to prevent the deceased from entering into his house, even to the extent of killing the deceased. But before he would have had the right to kill deceased, he must have first resorted to every other means in his power at the time.

"In passing upon the issues of self-defense in this case you must view the situation from the standpoint of the defendant alone and from no other standpoint."

We think these charges, as a whole, presented appellant's claimed self-defenses substantially correctly which were in any way raised by pertinent evidence.

Appellant's first assigned error is that the court erred in refusing to give his special charge No. 1, as follows:

"You are charged, as a part of the law of this case, that a man has the right to defend his premises from trespass, and to use such force as may be necessary in ejecting one trespassing upon his premises.

"Now, if you believe from the evidence in this case, that defendant, E. J. Jackson, shot and thereby killed Jim Bridges, but, at the time the deceased was trespassing upon the premises of defendant, and defendant and his wife, or either of them, had ordered deceased to leave said premises, and deceased refused to leave, the defendant had the right under the law to use such force as appeared to him at the time to be necessary to make deceased leave such premises. And if, when defendant attempted to make deceased leave such premises, deceased refused, either by word or act, and deceased made a demonstration as if to inflict death or serious bodily injury upon defendant, as viewed

from defendant's standpoint at the time, defendant would have the right to act in his own self-defense, and if you believe that defendant shot and thereby killed deceased under such circumstances, or if you have a reasonable doubt thereof, you will acquit defendant and say by your verdict 'Not guilty,'" assigning as a reason why the court erred in this particular that, independent of any other fact, he had the right to order deceased to leave his premises, and, upon deceased's refusal, if deceased as viewed from his standpoint made a demonstration as if to kill him or inflict serious bodily injury, upon him, he had the right to act in his necessary self-defense, claiming that the court's charge made his right to order deceased to leave his premises depend upon whether his wife had informed him that deceased had abused her and used insulting language towards her, or whether Kelly asked him to protect him from an assault from deceased or from deceased and others.

This charge, so far as it was the law and applicable to the evidence, was fully and substantially given in those of the court and those given as requested by him. He cites McMillan v. State, 73 Texas Crim. Rep., 343, and other cases along the same line, wherein we held in effect that it was error in submitting self-defense for the court in his charge to require the jury to believe numerous unimportant details of disputed facts leading up to the homicide before the jury was authorized to acquit. We think this case and none of the others cited by appellant, are in point, and we think appellant's criticism of the court's charge is unwarranted. The court does not by his charge require the jury to believe both, *and,* all the things stated by appellant before they were authorized to acquit him, but either one *or* the other, and we think that by no reasonable construction of the court's charge does it sustain appellant's contention. On the contrary, it is in effect and substance the reverse of what he does claim.

It was certainly unnecessary for the court to give the first paragraph of appellant's said refused charge, for, as said by Judge Henderson in Patterson v. State, 49 Texas Crim. Rep., 613: "It was not necessary for the court to especially direct the attention of the jury to the fact that appellant had the same right to protect said house or property as Alice Sharp had, being in her employ. In the charges given by the court this right was assumed to exist in appellant as her employee." Clearly the whole charge of the court herein did recognize and assume his right to forbid and prevent deceased from entering his house, and to use all force necessary to do this, even the taking of his life, provided he first used every other means in his power; and, especially taking the court's charge and the first one of appellant's quoted above given, his rights were in every way protected and properly submitted to the jury.

Wharton on Homicide (3d ed.), section 238, says: "A mere trespass either upon the property, person, or liberty of a person does not justify killing the trespasser, where there was nothing to create a reasonable belief in the mind of the slayer that any of the trespassers were about to commit a felony, or do him serious bodily harm. And the duty to

refrain from killing a mere trespasser is not limited to cases in which the trespass is committed in a peaceable manner. And though one has a right to resist an unlawful attempt to restrain his liberty, he must not kill in so doing, unless it is so persisted in, when lawfully resisted, as to induce in his mind a reasonable belief that the trespasser is about to commit a felony or do him great bodily harm. . . . And arming one's self to resist a mere civil trespass on land, or to drive invaders away, and killing to accomplish the object, can not be justified as self-defense, or even mitigated to manslaughter. Nor can a person killing another shield himself on a plea of self-defense, if he had reason to believe, and did believe, that his assailant only intended to commit a trespass, and did not intend to take life or inflict great bodily harm. One person is not justified in killing another in order to enjoy his lawful rights of property, unless he had reason to believe or did believe, as a reasonable man, at the time of the killing, that he was in serious danger of receiving great bodily injury or of losing his life, and that the killing was necessary to protect himself. . . ." Patterson v. State, 49 Texas Crim. Rep., 613; C. C. P., arts. 114-115-116, and note thereunder; P. C., art. 1110, subdiv. 4, and note thereunder.

The only other assignment of error urged by appellant in his brief is to the refusal of the court to give his special charge to the effect that, if the jury believed during his absence from home the deceased went thereto and was ordered to leave by his wife; or that she so informed him; then, in either event, he had the right to arm himself for the purpose of using such force as he reasonably expected might be necessary in ejecting deceased from his premises or preventing him from intruding himself into his home. We think the court in the charge he gave, quoted above, sufficiently covered this point so far as it was necessary or proper. Warthan v. State, 41 Texas Crim. Rep., 385.

Appellant in the record complains of the court's refusal to give other special charges requested by him, but those discussed herein are the only ones urged by him in the brief. The refusal of the others, we think, presents no error.

The judgment is affirmed.

*Affirmed.*